## KRUEGER v. BARTHOLOMAY BREWING CO.

(Supreme Court, Appellate Division, Fourth Department.   May 3, 1904.)

1. **INJURY TO EMPLOYÉ—BURSTING OF STEAM RESERVOIR—NEGLIGENCE.**
     Evidence in an action for death of an employé from steam escaping from a steam reservoir, a joint of which parted, as to original construction, repairs, and absence of tests, *held* sufficient to take the question of negligence to the jury.

2. **SAME—ASSUMPTION OF RISK.**
     Evidence in an action for death of an employé from the parting of a joint of a steam reservoir *held* insufficient to authorize a holding, as matter of law, that deceased knew the mechanical conditions of the machinery at which he was at work, so that he assumed the risk.

3. **SAME—CONTRIBUTORY NEGLIGENCE.**
     Evidence in an action for death of an employé from the parting of a joint of a steam reservoir *held* sufficient to authorize a jury to find that deceased was free from contributory negligence.

4. **SAME—VOLUNTEER.**
     An employer cannot escape liability for death of an employé on the ground that he was a volunteer, because the work in which he was engaged at the time of his death was not his regular employment; he having been sent to do the work by the employer's authorized representative.
     Stover, J., dissenting.

Appeal from Trial Term, Monroe County.

Action by Frieda Krueger, administratrix of William Krueger, deceased, against the Bartholomay Brewing Company. From a judgment dismissing the complaint, entered on a decision of nonsuit, and from an order denying a motion for a new trial on the minutes, plaintiff appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

George H. Harris, for appellant.
William A. Sutherland, for respondent.

HISCOCK, J.   It is conceded that plaintiff's intestate, while in the employ of defendant in February, 1901, met his death as the result of the bursting or parting at its joints of a large steam "header" or reservoir used in the latter's brewery.   It is assumed in the brief of defendant's counsel, as it apparently was upon the trial, that the immediate cause of death was the inhalation of the steam which was permitted to escape by reason of this rupture.   A co-employé of the intestate working near him was killed at the same time, and no surviving eyewitness of the accident was left.   It was and is claimed by plaintiff that this header was not only defective and unsafe in its original construction, but that its strength and efficiency had become still further impaired at the time of the casualty, as the result of water and steam escaping at its joints.   In granting the motion of nonsuit, the learned trial justice, by his remarks, perhaps indicated his doubts of the negligence of the defendant.   He placed his decision, however, more especially upon the grounds that intestate assumed any risks incident to the situation, and that plaintiff, through her inability to produce direct testimony as to the immediate cause and surroundings of the accident, did not suc-

cessfully meet the necessary burden of showing that her intestate was free from contributory negligence. We are unable to agree with these views, and with the result to which they lead, but think that the case should have been submitted to the jury.

Defendant was the owner of three breweries in the city of Rochester. In the one in question it had a battery of six boilers, three of 250 horse power each, and three of 75 horse power each. The header which burst or parted was designed for the reception and accumulation and subsequent distribution of the steam from these boilers. . It was constructed in 1892, and consisted of a large cylinder of extra heavy wrought iron, about 19 feet long and 16 inches in diameter. It was divided into four sections, and the joints were made by screwing these sections into heavy castiron T's. It was at one of the middle joints thus formed that the parting took place, the pipe of the cylinder simply pulling out of the T; and one of plaintiff's specific complaints is that the cylinder was not screwed far enough into the T, and also that, by the action of escaping steam and water to which we shall refer hereafter, the threads upon the end of the pipe and in the T had become worn and impaired. The six boilers all faced the same line. The header ran at their rear parallel with the line of the six, and a little above their top; being about 12 feet from the floor. The steam was conveyed from the boilers to the header by a line of pipes, which in the case of each boiler first rose perpendicularly therefrom, then ran horizontally to a point over the header, and then dropped perpendicularly downward into the latter. Plaintiff claims that this construction was improper, in that it allowed water driven from the boilers or formed by the condensation of steam to accumulate and lie in the header, and that this would have been avoided if the steam had been conducted upward by pipes through which any water might flow back into the boiler. At about 7 o'clock of the day of the accident, intestate was directed to go into the engine room and calk the joints of the header to prevent the leakage of steam or water. At the same time another employé was sent into the same room to plug or unplug a dead boiler. At about half past 10 the attention of other employés in other parts of the brewery was attracted by the noise of escaping steam, and, after the same had been shut off, it was found that the header had burst, as already stated, and intestate was found upon the floor, some 12 or 15 feet away from the broken joint, and the other employé was found some distance in the opposite direction. One was dead at the time, and the other one was unconscious, and lived only a short while.

We shall take up first the issue of defendant's negligence. There is no dispute that the header improperly parted, and that, as the result thereof, plaintiff's intestate met his death. The only question is whether it could be said that this casualty was the result of an accident, unavoidable and not to have been foreseen or anticipated by defendant, or whether it was the result of causes and defects of which defendant knew or ought to have known, and against which it should have guarded and protected the lives of its employés. In adopting the conclusion that the latter is the true proposition, we, of course, assume, in favor of the plaintiff, all of the facts which a jury might have found in her favor upon the evidence.

We direct our attention first to the manner in which the section of the cylinder was screwed into the T at the broken joint. The screw upon the end of the section consisted of 21 or 22 threads, covering a distance of about 2¾ or 3 inches. It was screwed into the T to the extent of only about 8 or 9 threads, or for a distance of about an inch and a quarter. If the joint were properly made, the strength and power of resistance there would be as great as at the middle or any other place in the section. The efficiency and strength of the joint would be directly in proportion to the number of threads by which the section was screwed into the T. We discover no dispute in the evidence that, under the circumstances, this ought to have been for a distance of about 2¾ inches, instead of for a distance of about 1¼ inches. The boilers were adjusted to blow off at 90 pounds, and the pressure of accumulated steam upon this cylinder was necessarily very great; and, as a matter of common experience and common judgment, as well as in the light of the expert testimony which was given upon the subject, we think it was permissible for a jury to say that it was not proper to make and leave this jont of 8 or 9 threads, instead of double that number. A jury, without any expert testimony, would know that this section would much more easily pull out of the T when it was screwed in to the extent of only 8 or 9 threads than it could have done if screwed in for double that number.

We have referred to the fact that steam was conducted from the boilers into the header in such a manner as to permit water to accumulate in the latter. For about a year after the structure was put in, the steam and water continually leaked at the joints, and nothing was done to tighten the latter. At the end of that period the joints were calked with lead on the outside, and were also repaired in some way by a boy crawling in through the pipe. Several months after the original construction, pipes known as "bleeders" were run into the header at different points for the purpose of drawing off the accumulated water, and thereafter the leakage of water at the joints was materially reduced, although it did occur to some extent. After the pipes were repaired at the end of the year, as above stated, there still continued to be a leakage of steam and some water at the joints, so that between that date and the time of the accident, in 1901, the joints had been calked 13 or 14 times. This calking was done by driving thin lead in at the joints where they leaked. It is argued by the learned counsel for the respondent that these 13 or 14 calkings were not of all the joints upon each occasion, and that, upon the theory that only one joint was calked at a time, the one which parted would have been repaired only two or three times in the course of these years. While the evidence is not entirely clear as to whether all of the joints, including the one in question, were calked upon each occasion, we think that the jury would have been permitted to find that the leakage, repairing, and calking of the joint in question was much more frequent than as suggested by counsel.

There does not seem to be any dispute that the leakage of steam and water at one of these joints would have an injurious effect upon the iron and upon the threads of the screw; the extent of injury, of course, being proportionate to the extent and continuation of the

leakage. The steam would cut or "eat" the thread, and the water would tend to affect or corrode the iron.

Coming to the joint in question, it is earnestly urged by defendant's counsel that the water could not have had such an effect upon the thread, because, if the iron had become corroded, the thread would have crumbled off and disappeared. The evidence of one of the witnesses who examined the joint after the accident was to the effect that the iron was discolored, and that the edges of the thread, instead of being sharp and perfect, were rounded off and somewhat bent. So that it seems to us that, whether as the result of these edges being eaten off by the steam, or having been affected by the leakage of water, the jury had a right to find that the thread had become impaired, and its strength and power of resistance to the pressure of steam diminished, and the accident and pulling apart made easier. This joint might have been so made that it would be as strong as any other part of the cylinder. The pressure of steam from the boilers was limited, and the cylinder itself was heavy enough and strong enough to bear several times any pressure which could possibly be put upon it from the boilers as they were adjusted. This joint did not stand the pressure as it might and should have done, and we think that the jury would have had the right to say that this failure was due to the original defect, in not screwing the section of the header in far enough, increased and aggravated by the impairment and weakening of the threads from the action of the leaking steam and water during the nine years the header had been in use.

If we are right in this conclusion, we have little difficulty in reaching the further one that the jury might have found defendant chargeable with knowledge of and responsibility for the condition of the joint. It is urged by its counsel that this appliance was put in the brewery by independent contractors of established standing and reputation, and that therefore defendant had a right to accept and rely upon their construction. We fail to find in the evidence, however, any sufficient basis for this argument. The defendant did hire some men to put up the header, but the latter disclaim responsibility for its location; and, at the time the joint in question was made in the brewery, defendant's chief engineer was present and saw the work done, and, both by his observation then and later of the thread upon the joint after the union had been made, must have known that the section was screwed into the T for less than half of the proper distance. Defendant, in the exercise of ordinary care, was not only bound to know of the subsequent leakage of joints, but the evidence clearly discloses that it did know it. Further than this, two tests were described upon the trial, known, respectively, as the hydrostatic and the hammer test, which, it is said, would have disclosed any defective condition of the iron, and neither of which was made. Therefore we think that it was for the jury to say whether the defendant used a proper degree of care and caution in the construction and maintenance of this header, and we pass to a review of the other issues presented.

In determining questions of assumed risks and contributory negligence, the trial justice seemed to have in mind that calking the joint might have had something to do with this accident, and that plaintiff,

87 N.Y.S.—67

in part, at least, was basing her claim upon the theory that the intestate, in that respect, had been placed in a dangerous line of duty, which led up to his death. We do not think that plaintiff asked or was entitled to succeed upon the theory that the mere operation of calking was dangerous or brought about the accident. It was done with a light hammer, chisel and lead, and had repeatedly been performed in this brewery without any bad effect whatever. Various witnesses said that it was not sufficient to produce any effect upon the pipes. We think that plaintiff's claim to recovery rests upon the allegation that her intestate was placed at work around and upon a defective appliance, which, without any active agency upon his part, caused his death; and the precise question is whether the intestate, as matter of law, can be charged with the knowledge of the condition of this joint, and with assumption of any risks which flowed therefrom. We do not think that he can. While he had been in defendant's employ for several years, a large part of this period had been passed at the other breweries. While he was at work at the one in question, it had for the most part been in another building. It is true that during some of the time he had been engaged as an engineer or assistant, having to do with watching and running the engines. But this was in another building. He had never but once before the occasion in question been at work in this room in the line of duty which called him there when he was killed. Save this one prior occasion when he was engaged in calking the header, he had had nothing to do with its erection, construction, or maintenance. There is nothing to show that he knew the condition of the joint in question, and of the frequent leakage of steam and water. Much less is there any evidence from which the court could say, as matter of law, that he not only knew the history of the header, but was so acquainted with its mechanical conditions and properties that he assumed all of the risks which resulted from its condition. In reference to the question of contributory negligence, while there was no direct evidence to show just what intestate and his co-employé were doing at the time the pipe parted, we still think there was sufficient testimony to enable a jury to say that the deceased was free from any negligent act which contributed to or brought about his accident and the resulting death. As already stated, he was found several feet from the bursted header, and very possibly, as suggested, he was not actually at work, calking the joint, when the explosion took place. It is undisputed, however, that he went to the room where he was found dead for the purpose of obeying and carrying out instructions which were given to him by a superior. He was told to go and do this work. He had been there once before for a similar purpose. A short time afterwards he was found in the room, and it is not claimed that he was there otherwise than in pursuance of the instructions which were given him. It is urged, however, that he or his co-employé may have done something which caused this explosion; but, after considering all that is said in behalf of defendant upon this subject, and even proceeding further into the realm of conjecture, we are unable to understand how either the intestate or his fellow workman could have caused the accident.. The fellow workman was sent there to work upon a boiler which under existing conditions had

no possible relation to, and could have had no possible effect upon, the header. The work which intestate was ordered to perform was not sufficient to drive the header apart. Ordinary experience, as well as direct testimony, indicates that the only way in which these parts could have been forced asunder was by the internal pressure of the steam, and that was not within the control of either of these workmen. The evidence would have amply justified the jury in finding that neither the intestate or his co-employé negligently did any act to bring about the catastrophe.

It is finally contended that intestate was employed by defendant for another purpose than calking pipes; that he was not called upon or authorized to go where he did, but was a mere volunteer, for whose misfortunes, under the circumstances, the defendant is not responsible. In opposition to this contention, the evidence shows that various employés were called upon to calk this header when it leaked, that intestate had been sent to do it once before, and that upon this occasion instructions were given to him to again perform this work by defendant's chief engineer or superintendent, who appears to have been fully empowered to give such orders. Under the circumstances, we think that defendant, through its representative, having sent the intestate to do this work, cannot successfully claim that it was free from any obligations to him as an employé while he was engaged in discharging his duty.

The case of Franck v. American Tartar Company (Sup.) 87 N. Y. Supp. 219, presents some features similar to those existing in the case at bar, and, to the extent thereof, is an authority in favor of the right of plaintiff to recover herein. The judgment and order should be reversed, and a new trial granted.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event. All concur, except STOVER, J., who dissents.